(No. 97486.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. FREDERICK E. HOOD, Appellee.

*Opinion filed December 2, 2004.*

Lisa Madigan, Attorney General, of Springfield, and Vincent F. Moreth, State's Attorney, of Carlinville (Gary Feinerman, Solicitor General, Linda D. Woloshin, Assistant Attorney General, of Chicago, and Norbert J. Goetten, Robert J. Biderman and James C. Majors, of the Office of the State's Attorneys Appellate Prosecutor, of Springfield, of counsel), for the People.

Donna S. Morrison and Brian L. Polinske, of Edwardsville, for appellee.

JUSTICE FITZGERALD delivered the opinion of the court:

Following a jury trial in Macoupin County, defendant Frederick Hood was convicted of illegal transportation of alcohol (625 ILCS 5/11—502(a) (West 2000)), failure to yield to a pedestrian in the crosswalk (625 ILCS 5/11—1002(a) (West 2000)), and reckless homicide (720 ILCS 5/9—3(a) (West 2000)), and sentenced to three years in the Illinois Department of Corrections. Defendant appealed, arguing in relevant part that the trial court erred by allowing the State's expert to testify in rebuttal. A majority of the appellate court agreed with defendant that the rebuttal testimony was improper because the State had violated the expert disclosure provisions of Supreme Court Rule 412 (188 Ill. 2d R. 412). The appellate court affirmed defendant's convictions for illegal transportation of alcohol and failure to yield to a

pedestrian in the crosswalk, but reversed defendant's conviction for reckless homicide and remanded for a new trial. 343 Ill. App. 3d 1245.

For the reasons discussed below, we reverse the judgment of the appellate court reversing defendant's reckless homicide conviction and remand to the appellate court for consideration of the balance of defendant's arguments on appeal.

## BACKGROUND

On the afternoon of November 28, 2000, defendant was driving his van westbound on Main Street in Mt. Olive, Illinois. As defendant made a left turn from Main Street onto southbound Poplar Street, his van struck 95-year-old Marie Schwab, causing serious injury. Schwab died approximately three weeks later.

David Smith, a Mt. Olive resident who witnessed the accident, testified for the State. Smith stated that on November 28, 2000, at about 3 p.m., he and his girlfriend, Tricia Marietta, picked up his son from school. Smith drove eastbound on Main Street and stopped at the stop sign at Poplar Street. The intersection of Main and Poplar is a four-way stop. The speed limit is 20 miles per hour. Smith observed a van coming from the east at a "pretty good rate of speed." Although it was Smith's turn to proceed through the intersection, he waited because he believed the van was not going to stop. To his right, on Poplar Street, Smith could see a woman, later identified as Marie Schwab, about halfway through the crosswalk. The van failed to stop at the stop sign and rounded the corner "at a pretty good clip *** rock[ing] to the right." Schwab raised her left hand, but the van did not stop. The van struck Schwab, lifting her off her feet and throwing her about five feet. Smith proceeded to the police station, which was a block away, to report the accident. As he drove through the intersection, he saw defendant exit the van, "kind of stumble and lean against the door."

Tricia Marietta similarly testified that the van defendant was driving did not stop or slow down as it approached Poplar Street. As the van turned onto Poplar, Marietta saw that defendant was looking north. Marietta saw Schwab raise her left hand, but the van did not stop until it struck her. Smith and Marietta, as well as an employee of the ambulance service that responded to the accident, testified that the weather was cloudy and overcast.

John Tandy, formerly a patrolman with the Mt. Olive police department, arrived first on the scene. He testified that Marie Schwab was lying motionless in the center of the road, south of the crosswalk. Defendant was leaning against one of the van doors, holding his 18-month-old son, Lucas. Tandy admitted meeting defendant on a couple of occasions but denied having a "confrontation" with him. Defendant told Tandy he was driving west on Main Street, came to a stop at Poplar Street, turned left and heard a thump or a thud, and then stopped. Tandy noticed a strong odor of beer on defendant's breath and that his eyes were glassy and bloodshot. Defendant did not make eye contact with Tandy. Defendant produced his license, but said he did not have his insurance card. Defendant offered to go home to get it. When Tandy asked defendant for the telephone number of a relative who could pick up Lucas, defendant had trouble relaying the number correctly. Defendant's speech was "a little slurred, a little garbled, mumbly."

Tandy further testified that he noticed an open cooler between the two front seats of the van. In the cooler were seven unopened, 12-ounce cans of Busch beer, five empty cans, one partially filled can, which was still cold, and some ice. Tandy smelled the open can to verify that it contained beer. Defendant told Tandy that he had two beers earlier in the day at Tillie's, a local tavern. According to Tandy, defendant refused to take any field sobriety

tests and volunteered that he would not take a breath test. Tandy placed defendant under arrest for driving under the influence of alcohol and hitting a pedestrian.

After checking on Schwab's condition and taking some measurements of the accident scene, Tandy transported defendant, who was handcuffed, to a hospital for the purpose of collecting blood and urine samples. As they walked through the hospital parking lot, a distance of 50 to 100 feet, Tandy had to take defendant by the arm a couple of times to keep him from falling. Defendant was "uneasy on his feet," "stumbling a little bit, staggering a little bit, weaving from side to side." A blood sample was collected at 5:40 p.m., approximately $2^1/2$ hours after the accident. During their wait at the hospital defendant stood the entire time. After the samples were collected, Tandy drove defendant to an ATM so that he could get cash in order to post bond, and then drove defendant back to Mt. Olive. Tandy testified that defendant had "sobered up quite a bit." The parties stipulated that defendant's blood sample indicated an alcohol concentration of 0.077.

Randy Gorman, a deputy with the Macoupin County sheriff's department, also responded to the scene. Gorman testified that he found Marie Schwab's sunglasses wedged in between the bug shield and the hood of defendant's van. Gorman observed no skid marks on the pavement. Upon speaking with defendant, Gorman noticed a strong odor of alcohol on defendant's breath and that his eyes were bloodshot and "glossy." Defendant's speech was mumbled and his walk was "wobbly." Gorman believed defendant was intoxicated. When Gorman asked defendant what happened, defendant said, "I guess the sun was in my eyes. I didn't see her." Gorman recalled that it was sunny and partly cloudy that day. Gorman further testified that a cooler, containing several cans of Busch beer, was in the van behind the driver's

seat. An open can of beer, partially full and still cold, stood upright in the cooler. Gorman escorted Tandy and defendant to the hospital. As they walked approximately 75 feet through the hospital parking lot, Gorman saw defendant staggering and swaying. Gorman left the hospital immediately after defendant's blood and urine samples were taken. At that time, defendant "appeared to be sobering up some."

The State also called Dr. Travis Hindman, a forensic pathologist who performed the autopsy of Marie Schwab. Dr. Hindman testified that the cause of her death was brain trauma due to injuries sustained in the collision on November 28, 2000. The State attempted to elicit "reverse extrapolation" testimony from Dr. Hindman in order to establish defendant's blood-alcohol level at the time of the accident, as opposed to the time defendant's blood was tested.[1] Defendant objected, arguing that the State had failed to disclose Dr. Hindman as an expert in this area. The trial court sustained the objection and the State rested.

Defendant called Bob Bonacorsi, who was acquainted with defendant through a mutual friend. Bonacorsi testified that he was driving west on Main Street shortly before the accident and that he had to stop his vehicle and look out the window because the "sun was in [his] eyes so bad *** [he] couldn't see anything."

Danielle Shelton, a bartender at J.C.'s Tap in Mt. Olive, testified that defendant entered the bar on the day of the accident at about 1:30 or 2 in the afternoon, looking for someone to help him move. With defendant was his young son. Defendant stayed for 30 to 45 minutes, drank one beer, and left. Defendant did not appear to be

---

[1]Reverse extrapolation is also referred to as "retrograde extrapolation." *E.g.*, *People v. Latto*, 304 Ill. App. 3d 791 (1999); *Reuter v. Korb*, 248 Ill. App. 3d 142 (1993); *Rice v. Merchants National Bank*, 213 Ill. App. 3d 790 (1991).

intoxicated. Joanne Cartwright, Shelton's mother and the owner of J.C.'s Tap, also recalled seeing defendant and his son at J.C.'s on the day of the accident. When Cartwright left J.C.'s, defendant did not appear intoxicated.

Denise Vojas, a bartender at Tillie's tavern in Mt. Olive, testified that she served defendant on the day of the accident. Defendant arrived about 1:30 p.m. or later with his son and stayed for 25 to 30 minutes. Defendant had a bottle of Busch beer, ordered another beer, drank half of it and left. Defendant did not appear intoxicated.

Defendant's mother, Hervana Hood, testified that she went to the accident site after receiving a call from the police to pick up Lucas. When she arrived, defendant was standing at the side of the van, holding his son. He did not have trouble standing and did not slur his words. Mrs. Hood did not notice any odor of alcohol on defendant's breath.

Defendant also called his longtime friend Kent Potillo. Potillo testified that on the day of the accident, at about 3 p.m., he was standing in front of a gas station on Main Street three blocks from the accident site. According to Potillo, "[W]e could see the police car with its lights on, but the sun was right practically on top of this building in the sky *** and you couldn't see down the street."

Defendant testified on his own behalf regarding a prior confrontation with Officer Tandy. According to defendant, on a Sunday afternoon in June or July 2000, defendant, his son, Lucas, and defendant's brother, Lonnie, were at a friend's home. Defendant's truck, which his brother had driven, was parked in the alley with the radio playing. Tandy arrived and told defendant the radio was too loud and to move the truck. Defendant refused, explaining that his brother was the driver. Defendant testified that, as he held his son, Tandy went for his gun.

Defendant told Tandy, "What are you going to do, shoot me, you son-of-a-bitch, over a radio, and I got a baby in my arms and I don't carry a knife or gun?" The argument continued. According to defendant, when Tandy finally left, he told defendant, for the second time that day, "I'll get you, you son-of-a-bitch."

With respect to the day of the accident, defendant testified that he drove his van from his Arkansas home, arriving in Mt. Olive around 1:30 or 2 p.m. Defendant brought his son, Lucas, with him. Defendant came to Mt. Olive to complete work on the house he was selling and to look for people to help him move. Defendant went first to J.C.'s and had one beer, which he testified was his first beer that day. Not finding anyone to help him move, he finished his beer and left after 30 minutes. Defendant then went to Tillie's. Although not finding anyone to help him move, he ordered a beer to not be rude. According to defendant, when he returned from the bathroom, the bartender had set up another beer. He drank part of it and left Tillie's around 3 p.m.

Defendant testified that as he drove west on Main Street, he pulled up to the stop sign at Poplar Street, saw another vehicle coming and hit his brakes. At the same time, he heard a noise from the back of the car; Lucas had thrown his bottle. Defendant testified that the sun was in his eyes as he made his turn onto Poplar Street. He looked back to check on Lucas, heard a "thunk" and immediately stopped. Defendant denied that he rounded the stop sign at 20 miles per hour or that the van was "rocking" to the side when he made the turn. Defendant further testified that prior to the accident he saw Marie Schwab "standing between a car on the other side of the road," and that he never saw her in the crosswalk. After the collision, he jumped out of his van and saw a friend in the area, whom he asked to get help. This friend was deceased at the time of trial.

Defendant testified that when police arrived, he was holding his son. Defendant said he had no trouble standing and was not leaning against the van. In response to Officer Tandy's questions, defendant said that he had a couple of beers at Tillie's. Tandy allegedly told him, "[Y]ou better hope she don't die or you're going [down] for murder." Defendant attempted to retrieve his insurance card from his briefcase behind the driver's seat, but Tandy stopped him. Defendant testified that he did not refuse to take any field sobriety tests; rather, he offered to take a sobriety test to clear himself. When Tandy placed defendant under arrest, he cuffed defendant's hands "extremely tight" behind his back. After defendant told Tandy that he had neck surgery nine months earlier and that being cuffed so tightly hurt him, Tandy said, "[N]ow I've got you, you son-of-a-bitch." Tandy then shoved defendant against the back "pillar" of the car door, injuring his back. Defendant claimed that he had trouble walking at the hospital due to this back injury, and that he was more comfortable standing than sitting. Defendant testified that when they left the hospital, Tandy drove to an ATM. Defendant denied asking Tandy to do so, but testified that he otherwise would not have had enough money to post bond.

With respect to the cooler and beer that officers found in his van, defendant testified that the beer had probably been in the cooler at least a couple of days. When asked to explain the ice, defendant said he had thrown a blanket over the cooler, which kept the contents colder. Defendant further testified that he lives in a dry county in Arkansas and must drive 25 miles for liquor, so he transports his beer in a cooler. Defendant stated that when he has a beer after completing a job for different people in Arkansas, he keeps the empty beer cans so as not to "trash up" their property. He also keeps the empty cans for his 13-year-old son, who sells them. Defendant

denied that a partially full can of beer was in the cooler on the day of the accident.

Finally, defendant's brother, Lonnie Hood, testified regarding the alleged confrontation between Officer Tandy and defendant. Lonnie testified that approximately four months before the accident, he and defendant were at a friend's home for a barbecue. Lonnie drove there in defendant's truck, parked it in the alley, and left the stereo playing. Lonnie went into the house and, a little while later, saw Tandy gesturing "very radically" at defendant. Lonnie went outside and heard defendant say, "What are you going to do, shoot me?" Lonnie testified he heard part of Tandy's response, which included the words "even with you."

Defendant rested. The trial court denied defendant's motion for a directed verdict.

Over defendant's objection, the State recalled Dr. Hindman to rebut defendant's testimony of sobriety. According to Dr. Hindman, whom the trial court qualified as an expert in toxicology, if an average male weighing 160 to 175 pounds consumed two and a half 12-ounce beers in a relatively short period of time, the blood-alcohol concentration would be 0.0625% at its highest point. The doctor further testified that the average rate at which alcohol is metabolized is 0.015% per hour. Therefore, after 2½ hours, a loss of 0.037 would occur and the blood-alcohol concentration at that time would be 0.0255. If, however, at 5:40 p.m., the same hypothetical person had an alcohol level of 0.077, his alcohol level 2½ hours prior thereto would have been 0.114%. The State elicited testimony from Officer Tandy to establish defendant's height and weight. As shown on defendant's driver's license, a copy of which was attached to Tandy's report, defendant was 5 feet 7 inches tall and weighed 160 pounds.

The State also called Officer Gorman in rebuttal. He

testified that Officer Tandy asked defendant if he would submit to field sobriety tests, that Tandy briefly explained each test to defendant, and that defendant refused. The State rested in rebuttal.

Based on Dr. Hindman's testimony, the jury was instructed, in relevant part, as follows:

> "If you find beyond a reasonable doubt that at the time the defendant drove a vehicle that the amount of alcohol concentration in defendant's blood or breath was .08 or more, you may presume the defendant was under the influence of alcohol.
>
> You never are required to make this presumption. It is for the jury to determine whether the presumption should be drawn. You should consider all of the evidence in determining whether the defendant was under the influence of alcohol."

The jury deliberated for 1 hour and 20 minutes and found defendant guilty of failure to yield to a pedestrian in a crosswalk (625 ILCS 5/11—1002(a) (West 2000)), illegal transportation of alcohol (625 ILCS 5/11—502(a) (West 2000)), aggravated driving under the influence of alcohol (625 ILCS 5/11—501(d)(1)(C) (West 2000)), and reckless homicide (720 ILCS 5/9—3(a) (West 2000)). Following a hearing in aggravation and mitigation, the trial court vacated the jury verdict on aggravated driving under the influence of alcohol, finding that offense to be a lesser-included offense of reckless homicide. The trial court sentenced defendant to a term of three years in the penitentiary for reckless homicide, and imposed fines for illegal transportation of alcohol and failure to yield to a pedestrian.

In his posttrial motion, defendant argued, in relevant part, that the trial court erred in permitting Dr. Hindman to testify as a rebuttal witness on extrapolation, and that the evidence was insufficient to support his convictions. The trial court denied defendant's motion and defendant appealed. A majority of the appellate court reversed defendant's conviction for reckless homicide,

holding that the State's conduct ran afoul of Rule 412 and that the trial court erred in allowing Dr. Hindman to testify in rebuttal. 343 Ill. App. 3d at 1252-55. The appellate court also rejected defendant's sufficiency of the evidence argument and affirmed his convictions for illegal transportation of alcohol and failure to yield to a pedestrian. 343 Ill. App. 3d at 1256-57. We allowed the State's petition for leave to appeal. See 177 Ill. 2d R. 315.

## ANALYSIS

Before considering the merits, we address the standard of review. A trial court's decision as to the appropriate sanction for a discovery violation is subject to abuse of discretion review. *People v. Eyler*, 133 Ill. 2d 173, 221 (1989), quoting *People v. Weaver*, 92 Ill. 2d 545, 558-59 (1982). Here, the appellate court concluded that, in light of the State's violation of Rule 412, the trial court abused its discretion by permitting Dr. Hindman to testify in rebuttal. 343 Ill. App. 3d at 1255. The threshold issue raised before this court, however, is not whether the trial court ordered an appropriate discovery sanction, but whether the State was guilty of a discovery violation in the first instance. Where, as here, the facts giving rise to the alleged discovery violation are not in dispute, the issue becomes one of law, which we review *de novo*. See *People v. Anthony*, 198 Ill. 2d 194, 201 (2001).

Supreme Court Rule 412 requires the State, upon motion of the defendant, to disclose certain material and information within the State's possession or control, including the following:

> "(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. ***
>
> * * *
>
> (iv) any reports or statements of experts, made in con-

nection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert[.]'' 188 Ill. 2d R. 412(a).

Based on the undisputed facts of this case, we conclude that the State fulfilled its disclosure requirements under Rule 412 with respect to the expert testimony the State attempted to elicit during its case in chief, and with respect to the expert testimony it presented during its case in rebuttal.

The record reveals that defendant filed a "Motion for Discovery before Trial.'' The State, in accordance with the trial court's order entered on defendant's motion, timely filed its answer to discovery. The State listed Dr. Travis Hindman, Sangamon County coroner, as one of the witnesses it might call at trial, and provided to defendant a copy of Dr. Hindman's autopsy report. The record further reveals that, on the afternoon of the first day of trial, before calling Dr. Hindman, the State disclosed to defendant that it intended to elicit reverse extrapolation testimony from the doctor. Defendant did not object at that time or otherwise call the matter to the trial court's attention. When, during the course of the doctor's direct examination, the State attempted to elicit extrapolation testimony, defendant objected, arguing that the State had failed to disclose the doctor's expertise in this area prior to trial. The State explained that it was unaware of Dr. Hindman's expertise in reverse extrapolation until that afternoon.

Significantly, defendant did not dispute that the State had no knowledge before the afternoon of the first day of trial that Dr. Hindman was qualified to offer extrapolation testimony. Moreover, defendant did not claim that the substance of the disclosure the State made at that time was inadequate under Rule 412. Defendant only argued that the disclosure should have come sooner. Thus, defendant effectively argues that the State violated

Rule 412 by failing to disclose information in advance of trial that the State simply did not possess at that time. Logic prevents us from adopting defendant's position. The State did all that it was required to do under Rule 412 based on its knowledge prior to trial, and all that it was required to do based on its changing knowledge during trial.

We recognize that had the prosecutor spoken to Dr. Hindman before trial, he might have learned that the doctor was qualified to offer reverse extrapolation testimony. In that case, the State would have been required to make the appropriate disclosure under Rule 412, providing to defendant any reports or statements Dr. Hindman made in connection with the case. 188 Ill. 2d R. 412(a)(iv). For whatever reason, however, the State did not speak to the doctor before trial. Defendant does not suggest that the State's conduct was a deliberate attempt to prevent disclosure of relevant information. *Cf. People v. Szabo*, 94 Ill. 2d 327, 349 (1983) (where the State deliberately destroyed potentially discoverable memoranda of pretrial statements by the State's key witnesses). Moreover, we will not presume bad faith by the State based solely on its seeming lack of advance preparation for trial. See *People v. Mahaffey*, 128 Ill. 2d 388, 418-19 (1989) (where the State was not obligated to disclose a witness' statement which was not memorialized in writing, court would not lightly presume bad faith based on the sole fact that defendant was surprised by witness' trial testimony). We are aware that "the purpose of the discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation." *People v. Heard*, 187 Ill. 2d 36, 63 (1999). But it is the defendant's burden to demonstrate prejudice. *Heard*, 187 Ill. 2d at 63. Under the facts of this case, defendant cannot demonstrate that he was prejudiced during the State's case in chief because the trial court, correctly or incor-

rectly, sustained defendant's objection to Dr. Hindman's extrapolation testimony.

Having found no violation of Rule 412 relative to the State's case in chief, and no prejudice to defendant arising during the State's case in chief from the lack of advance notice of Dr. Hindman's expertise in reverse extrapolation, we consider whether the State violated Rule 412 in connection with its case in rebuttal.

The State's duty to disclose a rebuttal witness arises when the State has formed the intent to call such witness. See *People v. Eveans*, 277 Ill. App. 3d 36, 48 (1996); *People v. Bock*, 242 Ill. App. 3d 1056, 1067 (1993); *People v. Fauntleroy*, 224 Ill. App. 3d 140, 162 (1991); *People v. Whitlock*, 174 Ill. App. 3d 749, 777 (1988). Because rebuttal testimony is intended to explain, contradict or disprove defendant's evidence (*People v. Lucas*, 132 Ill. 2d 399, 434 (1989), quoting *People v. Daugherty*, 43 Ill. 2d 251, 255 (1969)), the State typically cannot know the need for rebuttal until after the defense testimony is heard. See *Fauntleroy*, 224 Ill. App. 3d at 162; *Whitlock*, 174 Ill. App. 3d at 777. Thus, the State's intent to call a rebuttal witness frequently does not arise until the defendant has presented his or her case. This is precisely what transpired here.

Until defendant took the stand, the State could not know what specific testimony defendant would offer regarding his alcohol consumption on the day of the accident. Although the State introduced evidence through former officer Tandy that defendant claimed he had only consumed a couple of beers that day, defendant's purported admission on the day of the accident was not necessarily a reliable predictor of what defendant would say at trial. When defendant testified and persisted in his claim that he consumed only 2¹/₂ beers prior to the collision, defendant's position was made clear. Thus, following defendant's direct testimony and before the State

began its cross-examination, the State disclosed its intent to call Dr. Hindman as a rebuttal witness. The State explained that defendant's testimony could not be reconciled with the stipulated evidence that his blood-alcohol level 2½ hours after the accident was 0.077. We conclude that the State's disclosure was proper.

The appellate court, however, found the "nature" of the rebuttal testimony "troublesome." 343 Ill. App. 3d at 1255. The appellate court observed that the doctor's testimony went beyond rebutting defendant's claim that he was not under the influence of alcohol. Dr. Hindman's testimony allowed the jury, upon the State's request, to be instructed on the permissive presumption of intoxication. That is, the jury was instructed that if it found, beyond a reasonable doubt, that defendant's blood-alcohol concentration at the time of the collision was 0.08 or more, the jury could presume that defendant was under the influence of alcohol. See Illinois Pattern Jury Instructions, Criminal, No. 23.30 (4th ed. 2000). Defendant echoes the appellate court's analysis in his brief before this court.

We are aware of no rule, and defendant cites to none, that prohibits rebuttal testimony simply because that testimony, if believed by the jury, allows the jury to make a presumption adverse to defendant. In addition, we agree with the State that the jury could have been given the permissive-presumption-of-intoxication instruction even in the absence of Dr. Hindman's rebuttal testimony. Evidence presented during the State's case in chief established that the accident occurred a little after 3 p.m. The parties stipulated that defendant's blood-alcohol level 2½ hours later was 0.077. Without objection from defendant, Dr. Hindman testified during the State's case in chief that "the rule of thumb is an average-sized man weighing somewhere between 160 and 175 pounds will metabolize alcohol, that is, reduce the level of alcohol in

the blood by approximately .015 percent or 0.15 grams per deciliter in an hour." The jury, which observed defendant during trial, could judge for itself whether defendant was an average-sized man. If the jury believed Dr. Hindman's testimony, it could certainly do the simple arithmetic necessary to determine that defendant's blood alcohol at the time of the accident was at least 0.08—a mere three-hundredths of a percent greater than it was 2¹/₂ hours later at the hospital.

We also disagree with the appellate court's suggestion that Dr. Hindman's extrapolation testimony could only be presented, if at all, during the State's case in chief. 343 Ill. App. 3d at 1254. "Evidence which would tend to 'explain, repel, contradict or disprove the evidence of the defendant' is admissible in rebuttal even though such evidence would have been admissible as part of the State's case in chief." *Lucas*, 132 Ill. 2d at 434, quoting *Daugherty*, 43 Ill. 2d at 255.

The appellate court further determined that the State violated Rule 412(a)(iv) by failing to disclose Dr. Hindman's calculations prior to the doctor taking the stand during the State's case in rebuttal. Although conceding that the doctor's calculations were not technically "comparisons" for purposes of Rule 412(a)(iv), the appellate court held that the State should have disclosed the calculations under the "spirit" of the rule. 343 Ill. App. 3d at 1253.

We note first that defendant did not argue before Dr. Hindman testified, or in defendant's posttrial motion, that the State should have disclosed the doctor's calculations. This aside, the record establishes that defendant was well aware that Dr. Hindman would be testifying to the average rate alcohol is metabolized in the system and, using that rate, would arrive at a number reflecting defendant's blood alcohol at the time of the accident. Indeed, the State's direct examination of Dr. Hindman

during its case in chief provided a road map of the testimony the State would likely elicit from Dr. Hindman on rebuttal. After Dr. Hindman testified regarding the cause of death, the State questioned the doctor regarding his training in toxicology and his knowledge of how the body metabolizes alcohol. The State then queried the doctor about the rate at which the average person metabolizes alcohol. Finally, the State asked the following question, to which the trial court sustained defendant's objection: "So if a person had .077 percent alcohol, what would be their percent alcohol two hours prior to that if they didn't ingest anything for a two-hour period?" Thus, the record demonstrates that defendant was informed of the substance of Dr. Hindman's extrapolation testimony, if not the exact arithmetic.

Assuming, for the sake of argument, that the State should have disclosed Dr. Hindman's calculations under the "spirit" of Rule 412, we conclude that defendant waived any objection to the State's introduction of the doctor's calculations on rebuttal. The record reveals that the trial court allowed defendant the opportunity to speak with the State's rebuttal witnesses in advance of their testimony. The trial court expressly advised defendant: "Go talk to them if you want to. We'll give you time." Nothing in the record indicates that defendant acted on the trial court's advice. In addition, defendant never requested a continuance to secure his own expert or to consider more fully Dr. Hindman's expected testimony. Instead, the only relief defendant sought was complete exclusion of Dr. Hindman's rebuttal testimony. "A defendant cannot request only the most drastic measures, such as either an immediate mistrial or the total exclusion of testimony by a witness, and then on appeal argue that he is entitled to a new trial when these requests are not granted." *People v. Robinson*, 157 Ill. 2d 68, 78-79 (1993). When defendant elected to forgo more

moderate measures available during trial to deal with the State's purported discovery violation, and instead proceeded with trial, the claimed error, if any, was waived. See *People v. Bounds*, 171 Ill. 2d 1, 53-54 (1995); *Robinson*, 157 Ill. 2d at 79; *People v. Cisewski*, 118 Ill. 2d 163, 174-75 (1987).

Based on the foregoing, we find no reversible error based on the State's Rule 412 disclosures. The appellate court erred in ordering a new trial on that basis. Before determining the appropriate disposition of this case, however, we must consider defendant's argument that the evidence was insufficient to support his reckless homicide conviction. Defendant argues that "[t]here is no evidence that [he] was impaired at the time of the accident as the testimony was that [he] had two and one-half beers." Defendant contends that in the absence of evidence of intoxication or any other evidence of recklessness, his conviction cannot stand.

When reviewing the sufficiency of the evidence in a criminal conviction, the critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trial of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 149 Ill. 2d 558, 565 (1992). Applying this standard, we find the evidence was sufficient to support defendant's conviction for reckless homicide. Contrary to defendant's view of the record, the evidence was that defendant *claimed* he only had 2¹/₂ beers. The jury was free to disregard defendant's testimony as not credible, in light of the other evidence of intoxication. Apart from Dr. Hindman's testimony regarding defendant's blood-alcohol level, both Tandy and Gorman testified that they smelled alcohol on defendant's breath, that his eyes were glassy and bloodshot, his speech was slurred, and his walk was unsteady. Both officers believed defendant was intoxicated. In addition, the officers found

a cooler in defendant's van near the driver's seat containing ice, several full cans of beers, empty beer cans and one partially full beer can. Two eyewitnesses to the accident testified that defendant did not slow down as he approached Poplar Street, did not stop at the stop sign, and drove into Marie Schwab, who was in the crosswalk. The fact that defendant testified he was not intoxicated and that the sun was in his eyes does not mean that the jury could not find him guilty of reckless homicide beyond a reasonable doubt. "Where there is conflicting evidence of intoxication, it is the jury's function to determine the credibility of witnesses and the weight accorded their testimony." *Smith*, 149 Ill. 2d at 566. The jury here resolved any conflict in the evidence against defendant. Accordingly, we reject defendant's sufficiency of the evidence argument as a basis for reversal.

## CONCLUSION

For the reasons discussed above, we reverse the appellate court judgment reversing defendant's reckless homicide conviction. Because the appellate court found it unnecessary to consider all of the issues raised by defendant in light of its disposition of the case (343 Ill. App. 3d at 1255), we remand to the appellate court for consideration of those issues.

*Reversed in part and remanded.*