**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180072-U

Order filed December 7, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0072 Circuit No. 17-CF-696 |
| MYRUNE D. LINWOOD, | ) ) ) | Honorable Paul Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Presiding Justice Lytton and Justice McDade concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*:   The circuit court abused its discretion in barring a defense witness from testifying.

¶ 2      Defendant, Myrune D. Linwood, appeals his conviction for attempted first degree murder. He contends that the Peoria County circuit court abused its discretion when it barred a witness from testifying in defendant's case-in-chief. Defendant also contends that the court erred in admitting prior consistent statements of two State's witnesses. We vacate defendant's conviction and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4          The State charged defendant via indictment with attempted first degree murder (720

ILCS 5/9-1(a)(1) (West 2016)) and aggravated battery (*id.* § 12-3.05(e)(1)). The indictment

alleged that defendant shot Michael Diggins.

¶ 5          The parties appeared in court on November 30, 2017, 11 days before defendant's jury

trial was scheduled to begin. At that appearance, defense counsel informed the court and the

State that defendant on that day had provided her a list of five witnesses. Counsel expected to

tender to the State those names, their associated addresses, and the contents of their expected

testimony. The State expressed concern that it would not be able to complete an investigation of

those witnesses prior to trial. The court shared those concerns, stating that "[i]f the State is not

ready and they present a good reason for that, we'll entertain a motion to continue at that time."

The State asked that any delay be attributable to defendant on account of the late discovery, but

the court responded that such a judgment would only be made at the appropriate time.

¶ 6          Both parties announced that they were ready for trial on December 11, 2017. Defense

counsel filed a witness list the same day, which included the name Michael Glover. Prior to

commencing jury selection, defense counsel explained that she had spoken to Glover and

ascertained his testimony, which had been tendered to the State. Glover declined to provide an

address for the purposes of issuing a subpoena but had assured counsel that he would testify.

¶ 7          The evidence introduced at trial established that Diggins was shot several times at

approximately 3 a.m. on August 13, 2017, outside the Klub Karma nightclub in Peoria. Matthew

Gama, the general manager of the club on the date in question, testified that there had been a

fight inside the club which required security to "clear[ ] most of the people out the front" door.

Defendant was not a participant in the fight but was among the people cleared from the club. Approximately five minutes later, Gama was told that there had been gunfire outside.

¶ 8    Xyana Barnett testified that in the evening of August 12, 2017, she and a friend went to the Red Roof Inn for what they thought would be a party. When they arrived, a person who went by the name of "Muu" was there, along with some others. Having deemed that the gathering at the Red Roof Inn "wasn't a party," Barnett and her friend left for Klub Karma. Barnett only stayed in the club for two minutes because the crowd was so large. She exited to the parking lot, where there was also a large crowd. Barnett denied seeing Muu exit the club or go to his vehicle.

¶ 9    The State then directed Barnett's attention to a statement she had made to Officer Roberto Vasquez on August 15, 2017. Barnett repeatedly insisted that she had merely relayed to police "a statement that [her] auntie told [her] to give them." The State continued to ask if Barnett had made certain statements related to Muu's involvement in the shooting, and Barnett alternatively denied making the statements outright or insisted that she only told the police what her aunt had told her. She also testified that she was intoxicated when she spoke to the police. Barnett's aunt wanted her to tell the police this story so that Barnett herself would not be in trouble.

¶ 10    On cross-examination, Barnett agreed that she knew defendant by the name "Muu." She did not know what happened on the night of the shooting.

¶ 11    Vasquez testified that he interviewed Barnett two days after the shooting. Barnett told him that she met defendant at the Red Roof Inn and rode with him to Klub Karma. Defendant entered the club and came out a short time later with an injury to his lip. Defendant told Barnett that someone had struck him with a bottle. Defendant then retrieved a black handgun from the vehicle that he and Barnett had driven in. Barnett grabbed defendant's arm and told him not to

3

shoot anyone. Barnett told Vasquez that defendant fired several rounds at Diggins. Video recordings showing Barnett's statements to Vasquez, as well as Barnett identifying defendant in a photographic lineup, were played in court without objection.

¶ 12        Diggins testified that he was shot 14 times after he "[h]ad a couple words with a person." He did not know who shot him. Diggins conceded that he told Vasquez that defendant shot him. Diggins also identified defendant's photograph as the person that shot him.

¶ 13        On cross-examination, Diggins testified that he told Vasquez that defendant shot him only because that was the account that he had heard; he did not actually know if defendant shot him.

¶ 14        Investigator Timothy Moore testified that on the evening before trial, Diggins told him that he was concerned about testifying because defendant had "a very large family and [Diggins] didn't want to have to look over his shoulder the rest of his life."

¶ 15        The State rested its case on December 13, 2017. Defense counsel informed the court that she would be calling three witnesses. One witness would be the man disclosed as Michael Glover. However, in speaking to him at the courthouse, counsel had learned that his real name was actually David Dillard. He had provided a false name because "he did not want to get involved in this."

¶ 16        Counsel explained that Dillard "anticipate[d] testifying to a statement that the victim made to him in the last four weeks regarding his identification of the defendant." Counsel acknowledged that she would first need to recall Diggins to ask if he made certain statements to Dillard, so that Dillard's testimony could be properly admitted as impeachment evidence. The court stated that it understood.

4

¶ 17    Counsel also asserted that while Dillard had provided a false name, "the evidence will remain the same." His account would be the same as that originally relayed to the State. Moreover, counsel indicated that a State's investigator had already spoken to Dillard, and that she was under the impression that the account Dillard provided to the investigator was consistent with the account he had provided to her.

¶ 18    The State objected, asking that Dillard be barred from testifying as a sanction for a discovery violation. In response, defense counsel again pointed out that "his testimony would be the same as what he told me and the State." The court instructed that defense counsel provide the State with Dillard's full name and birthdate so that it could check his criminal history. The court reserved ruling on the State's objection.

¶ 19    Counsel stated that Dillard's birthdate was June 26, 1972. The State, having apparently entered that information into a computer while in the courtroom, declared: "I think Mr. Dillard is lying about his date of birth," explaining that it had found a David Dillard with a different birthdate. With defendant's consent, the court ordered that Dillard could be subjected to *voir dire* to answer any questions about his identity prior to its ruling on the State's objection.

¶ 20    First, however, defendant called Nae'Keicha Linwood and Darnell Bell in his case-in-chief. Nae'Keicha, defendant's sister, testified that she watched defendant enter his vehicle and drive away immediately after Klub Karma was cleared out because of the fight. Bell, defendant's friend, testified that he also watched defendant drive away from the club soon after the fight.

¶ 21    The court then had the jury removed from the courtroom so the parties could readdress the Dillard issue. Defense counsel explained that she had spoken to Dillard either the day or day after defendant had given her his witness list. She continued:

"At that time, he was hesitant to get involved but did give me information about a conversation he had with the victim wherein the victim said he misidentified [defendant]. I then emailed the State again and said I have further information about Mr. Glover and here it is."

Counsel again pointed out that a State's investigator had interviewed Dillard. The State confirmed that fact. The State added: "I would remind the Court he also gave counsel a fake date of birth." Defense counsel insisted there had been no prejudice:

"[H]is testimony is the same. It has not changed. *** [W]hether his name is John Smith, Michael Glover, or David Dillard, his testimony and the effect on the trial would be the same. The State is not prejudiced by this change of information at this point. ***

They've still been able to prepare for the same statement."

¶ 22    Dillard took the witness stand and repeated that his birthdate was June 26, 1972. Dillard testified that he had a son by the same name; while he did not know his son's birthdate, he knew that he was presently incarcerated. The court noted that the Illinois Department of Corrections website indicated that a David Dillard born on December 29, 1995, was currently in custody. The State confirmed that that was the date of birth it had seen. The court stated: "So it looks as though this David Dillard could have given a correct date of birth to [defense counsel]."

¶ 23    Dillard confirmed that he only told counsel his real name for the first time that day. He agreed that he had a 2011 felony conviction "for drugs."

¶ 24    The court sustained the State's objection and barred Dillard from testifying:

"Additional reasons include not just the late disclosure. Trials are a fluid thing. Even in this case we have had some issues to deal with on the spur of the

6

moment. But I cannot countenance fraud being perpetrated on the Court and done so in a manner consistent with the testimony and demeanor of the individual who was just here involving numerous smiles and a nonchalant carefree lack of dignity and respect demeanor [*sic*]. It just can't happen."

¶ 25    The jury ultimately found defendant guilty on both counts. The court merged the counts and sentenced defendant to 36 years' imprisonment. This appeal follows.

¶ 26                                II. ANALYSIS

¶ 27    Defendant raises two contentions of error on appeal. First, he argues that the circuit court abused its discretion in barring Dillard from testifying. Second, he contends that the evidence of Barnett's and Diggins's statements to the police constituted prior consistent statements and was therefore inadmissible.

¶ 28                             A. Discovery Sanctions

¶ 29    Illinois Supreme Court Rule 413(d)(i) (eff. July 1, 1982) requires the defense, within a reasonable time after the filing of a written motion by the State, to disclose the names of persons intended to be called as defense witnesses. Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971) holds that if any party fails to comply with a rule of discovery, "the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances."

¶ 30    The purpose of the discovery rules is to protect the parties from surprise, unfairness, or inadequate preparation. *People v. Hood*, 213 Ill. 2d 244, 258 (2004). "Sanctions are intended to accomplish the purpose of discovery, not to punish the offending party, and the imposition thereof should not encroach on a party's right to a fair trial." *People v. Scott*, 339 Ill. App. 3d

7

565, 572 (2003). Moreover, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). Accordingly, the exclusion of certain testimony as a sanction for a discovery violation is disfavored, "and is appropriate in only the most extreme situations." *Scott*, 339 Ill. App. 3d at 573. Factors to be considered in determining whether the exclusion of a witness was an appropriate sanction are the effectiveness of a less severe sanction, the relevance of the proposed witness's testimony to the outcome of the case, the prejudice to the aggrieved party, and evidence of bad faith in the violation of the discovery rules. *Id.*; see also *People v. Ramsey*, 239 Ill. 2d 342, 431 (2010) (applying "the factors enumerated by the *Scott* court"). A circuit court's imposition of discovery sanctions is reviewed under the abuse of discretion standard. *People v. Kladis*, 2011 IL 110920, ¶ 23.

¶ 31      In the present case, Dillard's proposed testimony was potentially highly relevant to defendant's case. As counsel explained, Dillard would testify that Diggins told him that he had misidentified defendant as Diggins's shooter.[1] The State's case was based almost entirely on the recanted statements of Barnett and Diggins—while both had originally implicated defendant in the shooting, both testified at trial that they did not know who the shooter was. Dillard's testimony, which would undermine Diggins's statement to the police, could have been particularly beneficial to the defense.

¶ 32      It is also apparent that the State suffered no prejudice as a result of the late disclosure of Dillard's real name. As defense counsel repeatedly pointed out, Dillard's testimony was not changing. Counsel had informed the State of Dillard's expected testimony, and the State

---

[1]Defense counsel, tacitly acknowledging that Dillard's testimony would be hearsay, made clear that she would first have to question Diggins about that conversation, in order to introduce Dillard's testimony in impeachment. Neither the State nor the circuit court, nor the State on appeal, raised any evidentiary concerns with Dillard's proposed testimony.

8

confirmed that its investigator had spoken with Dillard. The State did not dispute defense counsel's explanation of what Dillard's testimony would be. Indeed, the State never made any allegation that Dillard's testimony would result in surprise, lack of preparation, or any other sort of unfairness—it simply argued that a discovery violation had been committed and that Dillard's testimony should be barred as a result.

¶ 33    Given that "the purpose of the discovery rules is to protect the accused against surprise, unfairness, or inadequate preparation," (*Hood*, 213 Ill. 2d at 258 (quoting *People v. Heard*, 187 Ill. 2d 36, 63 (1999))) and that "[s]anctions are intended to accomplish the purpose of discovery, not to punish the offending party," (*Scott*, 339 Ill. App. 3d at 572) we conclude that no sanction was necessary in this case. The State suffered no injury that needed to be remedied via discovery sanction. Accordingly, we find that the circuit court abused its discretion by imposing the most extreme sanction of barring Dillard's testimony as a result of defense counsel's late disclosure of his real name.

¶ 34    The State on appeal effectively concedes that barring Dillard's testimony was not justified as a discovery sanction. Instead, it raises three other grounds on which it contends this court should affirm. First, it argues that defendant has forfeited his argument for failing to make an offer of proof regarding Dillard's testimony below. Second, the State argues that the court's decision was nevertheless supported on other grounds. Finally, it argues that any abuse of discretion in barring Dillard's testimony was harmless. We address these arguments in turn.

¶ 35    The State relies on our supreme court's decision in *People v. Andrews*, 146 Ill. 2d 413, 422 (1992), for the proposition that, in the State's words, "[t]he failure to make an adequate offer of proof results in forfeiture of the issue on appeal." *Andrews*, in fact, does not make such a broad statement of law. Rather, the court in *Andrews* found forfeiture where there was "no record

9

from which this court can determine if the excluded evidence had any relevance to the proceedings at hand." *Id.* That is not the case here, as defense counsel explained that Dillard would testify that Diggins told him that he misidentified defendant as the shooter. The State, whose investigator had interviewed Dillard, did not dispute this account. Thus, we *can* determine the relevance of the excluded testimony, and need not find the issue forfeited.

¶ 36　　　Next, the State asserts that the court's exclusion of Dillard's testimony was proper "because Dillard was not credible and perpetrated a fraud upon the court." It is well-settled, however, that "it is the function of the jury as the trier of fact to assess the credibility of witnesses," (*People v. Tenney*, 205 Ill. 2d 411, 428 (2002)), and the State has identified no cases supporting the proposition that the circuit court has discretion to bar witnesses based on its own credibility determinations.

¶ 37　　　Similarly, the State has cited to no authority holding that purported fraud or fraud on the court are grounds to wholly bar a witness. In fact, the State has not demonstrated that Dillard's conduct even rose to the level of those infractions. Black's Law Dictionary defines "fraud" as the misrepresentation or concealment of a material fact "made to induce another to act to his or her detriment." Black's Law Dictionary (11th ed. 2019). Dillard's name was not a material fact in the case, nor is there any evidence that Dillard's intent was to induce anyone to act to their detriment. Black's defines "fraud on the court" as "a lawyer's or party's misconduct so serious that it undermines or is intended to undermine the integrity of the proceeding. Examples are bribery of a juror and introduction of fabricated evidence." *Id.* We cannot say that Dillard's lie about his name rose to this level of malfeasance.

¶ 38　　　Finally, the State argues that any error in excluding Dillard's testimony was harmless, asserting that "there is no reasonable probability that the jury would have acquitted the defendant

10

without error." We disagree. As explained above, the primary evidence against defendant was the statements to the police made by Barnett and Diggins. Yet, both witnesses recanted those statements at trial, instead testifying that they did not know who the shooter was. Dillard's testimony had the potential to cast doubt upon Diggins's statement to the police. We therefore cannot find that the error was harmless.[2]

¶ 39     Accordingly, we find that the circuit court committed an abuse of discretion and reversible error when it barred Dillard from testifying at defendant's trial. We therefore vacate defendant's conviction and remand the matter for a new trial.

¶ 40                                          B. Prior Consistent Statements

¶ 41     Our decision to vacate defendant's conviction based on the improper exclusion of testimony renders defendant's second argument on appeal moot. This court may consider otherwise moot issues when they are likely to recur at retrial. See *People v. Jones*, 105 Ill. 2d 342, 353 (1985). Here, it is clear that the State will likely attempt to introduce the same evidence on retrial that defendant has taken exception to on this appeal.

¶ 42     Nevertheless, we observe that defendant has raised this issue under the umbrella of plain error because defense counsel did not object to or file a motion *in limine* seeking to exclude the evidence in question. Where any questions related to the evidence of Barnett's and Diggins's prior statements have not been addressed by the parties or the court below, it would be inappropriate for this court to address those questions for the first time on appeal having already

---

[2]We note that the State recites the harmlessness standard applicable to evidentiary errors—whether a reasonable probability exists that defendant may have been acquitted but for the error. Where a constitutional error has been committed, however, the State must instead prove that said error was harmless beyond a reasonable doubt. *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (setting out both standards). As discussed above, the barring of witnesses encroaches upon a defendant's fundamental constitutional right to present witnesses in his own defense. *Taylor*, 484 U.S. at 408. In any event, we find that the State has failed to prove harmlessness under either standard.

found remand necessary. It is sufficient that this decision should put defense counsel on notice of defendant's concerns. Moreover, we direct the attention of all parties to Illinois Rule of Evidence 613 (eff. Sept. 17, 2019), which controls the admissibility of prior statements of witnesses.

¶ 43                                 III. CONCLUSION

¶ 44       The judgment of the circuit court of Peoria County is vacated, and the matter is remanded for further proceedings.

¶ 45       Judgment vacated.
¶ 46       Remanded.