# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Blair*, 2011 IL App (2d) 070862

---

| | |
|---|---|
| Appellate Court Caption | The People of the State of Illinois, Plaintiff-Appellee, v. Ricky G. Blair, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2–07–0862 |
| Filed | May 26, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Pursuant to a supervisory order of the Illinois Supreme Court directing the appellate court to reconsider its opinion in light of *People v. Thompson,* the appellate court affirmed defendant's convictions on two counts of aggravated domestic battery, notwithstanding defendant's contentions that the trial court failed to fully comply with Supreme Court Rule 431(b) and violated Supreme Court Rule 412 by allowing a physician to testify without disclosing, via a statement of his qualifications, his status as an expert, since defendant could not have been prejudiced by the trial court's violation of Rule 431(b) where the prospective jurors were informed of all four *Zehr* principles during the trial court's initial comments, defendant elected to testify, and the jury was instructed defendant was presumed innocent, and the physician was not retained as an expert to render an opinion at trial, he testified as a treating physician in his capacity as the radiologist on call to interpret diagnostic films, his medical reports were tendered to defense counsel, and he was disclosed pursuant to Supreme Court Rule 412(a)(i). |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 06–CF–1268; the Hon. Joseph G. McGraw, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|
| Counsel on<br>Appeal | Patricia Unsinn and Jonathan D. Krieger, both of State Appellate<br>Defender's Office, of Chicago, for appellant. |
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer,<br>of State's Attorneys Appellate Prosecutor's Office, of counsel), and<br>Stephanie Hoit Lee, of Algonquin, for the People. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Presiding Justice Jorgensen and Justice Schostok concurred in the<br>judgment and opinion. |

## OPINION

¶ 1        Following a jury trial in the circuit court of Winnebago County, defendant, Ricky G. Blair, was found guilty of two counts of aggravated domestic battery (one count based on great bodily harm and one count based on permanent disfigurement) (720 ILCS 5/12—3.3(a) (West 2006)). The trial court vacated the permanent-disfigurement-based conviction on one-act, one-crime principles and sentenced defendant to seven years' imprisonment. Defendant appealed, urging the reversal of his conviction on two grounds. First, he asserted that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) in that it did not ask each prospective juror during *voir dire* if he or she understood and accepted each of four key principles governing criminal trials. Second, defendant contended that the State violated Illinois Supreme Court Rule 412 (eff. May 1, 2001) by calling a doctor to provide testimony without first disclosing, via a statement of his qualifications, the doctor's status as an expert. In an opinion filed on September 29, 2009, we rejected defendant's second contention but agreed that the trial court's failure to comply with Rule 431(b) required the reversal of defendant's conviction, and we remanded the cause for a new trial. *People v. Blair*, 395 Ill. App. 3d 465 (2009). On January 26, 2011, the Illinois Supreme Court issued a supervisory order directing us to vacate our September 29, 2009, judgment and reconsider our decision in light of *People v. Thompson*, 238 Ill. 2d 598 (2010). *People v. Blair*, 239 Ill. 2d 558 (2011) (table). Having done so, we now affirm the judgment of the trial court in its entirety.

¶ 2                               I. BACKGROUND

¶ 3        Defendant was charged by superseding indictment with one count of aggravated battery (720 ILCS 5/12—4(b)(1) (West 2006)), two counts of aggravated domestic battery based on

permanent disfigurement (720 ILCS 5/12—3.3(a) (West 2006)), and one count of aggravated domestic battery based on great bodily harm (720 ILCS 5/12—3.3(a) (West 2006)). The charges stemmed from a March 2006 altercation between defendant and Joya Scott at the Brewington Oaks apartment complex. The aggravated battery count and one of the aggravated domestic battery (permanent disfigurement) counts related to a knife wound sustained by Scott in her arm. The remaining counts alleged that defendant punched Scott in the face, causing permanent disfigurement (a laceration) and great bodily harm (a broken nose). Jury selection commenced on June 11, 2007. Once the jury was seated, the following evidence was presented.

¶ 4        Scott and defendant began dating in the spring of 2005. Scott had cohabited with defendant in the past, but was not living with him at the time of the altercation. Nevertheless, Scott allowed defendant to spend the night of March 17, 2006, at her apartment. To that end, Scott prepared a "pallet" on her living room floor for defendant to sleep. Scott normally slept on a couch in her living room because she did not have a bed in her apartment.

¶ 5        Scott testified that she and defendant had been using cocaine on the night in question. After they ran out of cocaine, she and defendant got into an argument because defendant wanted more drugs and Scott would not buy them. Initially, the argument was verbal, with defendant repeatedly telling Scott to "shut up" whenever she spoke. Scott eventually went to lie down on the couch, and defendant lay down on the makeshift bed on the floor. Scott testified that she placed a "little steak knife" under her pillow because of a prior incident in December 2005 during which defendant gave her a black eye and beat her with a belt. The March 2006 fight became physical when defendant hit Scott repeatedly in the face. As defendant was striking Scott, she reached for the knife. A struggle ensued for control of the knife. The blade of the knife broke off while it was stuck in Scott's arm. As Scott explained, she "broke the knife off in [her] wrist." At some point, defendant also began choking Scott. According to Scott, defendant then hit her in the nose and she lost consciousness.

¶ 6        The next thing Scott remembered was waking up in the bathroom, where she saw defendant cleaning up. Scott testified that her clothes had been changed. Scott asked defendant to call an ambulance, but whenever she spoke, defendant started choking her. At some point, defendant left the bathroom, and Scott ran to the building security office. She told the security guards that her boyfriend tried to kill her. Subsequently, Scott was transported to a hospital and treated, receiving six stitches in her right arm and four stitches on her nose. Scott testified that around Father's Day 2006 she saw defendant in Chicago and asked him to turn himself in.

¶ 7        During her testimony, Scott identified clothing worn by her and defendant during the March 2006 altercation. Scott acknowledged, however, that she did not turn those articles over to the police until shortly before the trial and that she did not inform the police that defendant had changed her clothes. With respect to the December 2005 incident, Scott testified that in response to defendant's conduct she grabbed a knife and stabbed defendant in the arm. Scott also admitted that she was on probation and that, at the time of her testimony, a petition to revoke her probation was pending. Nevertheless, Scott denied that her testimony was being provided in exchange for a deal with the State.

¶ 8		Cecilia Lindley worked security at Brewington Oaks in March 2006. Lindley testified that around 2:20 a.m. on the night in question, she and Christopher Goldberg, another guard, were in the building security office when a tenant began pounding on the door. Lindley opened the door and saw Scott. Lindley testified that Scott was "scared and crying" and had a "swollen and busted eye," a bloody nose, and a cut on her right arm. After Scott entered the security office, she stated that her boyfriend had held her hostage for about an hour. As Goldberg tended to her injuries, Scott began "blacking in and out." Lindley called 911.

¶ 9		Officer Bill Donato of the Rockford police department testified that he was dispatched to the Brewington Oaks apartment complex. Upon entering the building security office, Donato observed a black female, later identified as Scott, with a "gash" on the bridge of her nose. A security guard was holding a towel over Scott's right forearm. Donato testified that Scott appeared to be in shock. Donato had a brief conversation with Scott, during which she stated that her boyfriend, whom she identified as defendant, had stabbed her and punched her in the face. Scott also told Donato that she believed that defendant was still in her apartment. After Scott was transported to SwedishAmerican Hospital, Donato and several other officers went to her apartment. Donato inspected the apartment and saw blood and a knife, but defendant was not present. After members of the Rockford police department identification unit arrived, Donato went to the hospital to speak with Scott. Scott provided Donato and Officer Spencer Burke a couple of addresses within her apartment complex where she thought defendant might be. The officers returned to the apartment complex, but were unable to locate defendant at any of those addresses. Thereafter, Donato and Burke returned to the hospital and conducted a full interview with Scott, during which Scott gave the officers a written statement.

¶ 10		On cross-examination, Donato testified that Scott was coherent and cooperative during the interview. Donato was unable to recall whether Scott indicated anything about defendant choking her while she was in the bathroom, but he admitted that there is nothing in his report to that effect. Donato also stated that nowhere in his report is there any indication that Scott told him that defendant changed her clothes during the March 2006 incident. Donato testified that, as part of his interview with Scott, he asked about her relationship with defendant. Scott told Donato that she had been dating defendant for about eight months. Scott mentioned a prior altercation during which defendant had punched her, causing a black eye. Scott also acknowledged stabbing defendant on a previous occasion. Donato could not recall Scott telling him that defendant had hit her with a belt.

¶ 11		Detective James Bowman testified that he processes and documents crime scenes and recovers physical evidence as part of the Rockford police department's identification unit. Bowman testified that he and Detective Hackbarth were dispatched to Scott's apartment in response to a report of an aggravated battery with a knife. After being briefed on what occurred, Bowman began taking digital photographs and documenting the evidence. As part of this process, Bowman recovered a knife that was broken in two pieces. Bowman then proceeded to SwedishAmerican Hospital to photograph Scott's injuries. The photographs showed a laceration across the bridge of Scott's nose and a "slashing wound" on her right forearm. On cross-examination, Bowman testified that no attempt was made to recover fingerprints from the knife found in Scott's apartment.

¶ 12    Chandra Norder-Brandli, a nurse at SwedishAmerican Hospital, testified that at approximately 2:40 a.m. on March 18, 2006, she treated Scott in the hospital's emergency room. Norder-Brandli described Scott's initial demeanor as "scared and crying." Scott's injuries included a laceration on her nose, a bruised and swollen left eye, bruising under her right eye, a laceration on her right forearm, and a swollen left wrist. Scott told Norder-Brandli that the laceration on her right forearm was from a knife. After a doctor evaluated Scott, Norder-Brandli sutured the lacerations on Scott's nose and her right forearm. On cross-examination, Norder-Brandli stated that Scott was coherent during her treatment. Norder-Brandli also stated that she did not observe Scott lose consciousness while in the emergency room. However, Norder-Brandli testified that Scott did tell her that she "thought that she may have lost consciousness" during the events of that evening.

¶ 13    Dr. Edward Steffen, a board-certified radiologist at SwedishAmerican Hospital, testified about his qualifications and experience. Thereafter, Dr. Steffen testified that, although he did not physically examine Scott, he did read all of her X rays and CAT scans. Over defense counsel's objection, Dr. Steffen testified that a CAT scan of Scott's face showed a broken nose. Dr. Steffen further testified that, based on his training, education, and experience, such an injury is caused by blunt force trauma, *i.e.*, the face or the eye socket striking some hard object or some hard object striking the face or the eye socket.

¶ 14    Detective Jeff Houde of the Rockford police department testified that he met with Scott at her apartment complex on May 12, 2007, to recover some items that were related to the March 2006 altercation. At that time, Scott turned over a plastic garbage bag containing some clothing and linen items. Notably, the bag contained two pairs of pajama pants, a T-shirt, a bath towel, a pair of sweatpants, a sweatshirt, and a pillow case.

¶ 15    After the State rested, defendant's motion for a directed verdict was presented and denied. Defendant then testified on his own behalf. Defendant recounted that on March 17 and 18, 2006, he and Scott were using cocaine that Scott had purchased from someone in her apartment complex. Defendant testified that he had not planned on spending the night at Scott's apartment, but she asked him to do so, and he agreed. Around midnight, defendant and Scott began arguing. According to defendant, Scott wanted to purchase more drugs. Defendant responded that doing so would be impossible because they did not have any money.

¶ 16    Defendant testified that, after the initial exchange, things calmed down for 10 or 15 minutes before the argument continued. Defendant testified that Scott again insisted on obtaining more drugs. Defendant again told Scott that he had no money, but Scott stated that she would ask the dealer to provide her the drugs on "credit." Defendant told Scott to "call it a night, lay it down." Scott responded that defendant could not tell her what to do. She then entered the kitchen and began pacing back and forth before opening a drawer and pulling out a knife. Defendant then got into the makeshift bed on the floor and began watching television. Scott moved to the couch as she held the knife in her hand. At that point, things again calmed down.

¶ 17    Defendant stated that as he was watching television he began to fall asleep. The next thing he remembered was Scott saying in a raised voice, "You got to get out of here."

Defendant testified that Scott looked as if she had "snapped." Defendant again advised Scott to "call it a night," and she calmed down. However, a few minutes later, Scott stated, "No, it's if you got to go [*sic*]." Defendant stated that he glanced at Scott and "she was on the verge of standing up and reaching up under the pillow." Defendant thought that Scott had placed the knife under the pillow on the couch, because it was no longer in her hand. Defendant stated that he then "jumped up in defense" and approached Scott. Defendant explained that, when he did so, Scott had her back turned and she was in a crouching position. Defendant grabbed Scott's arms from behind, and the two fell forward onto the couch.

¶ 18 Defendant testified that, by the time he reacted, Scott had control of the knife and it "must have evidently stabbed her in the arm," although he did not actually see the knife puncture Scott. Scott told defendant to get off her because she was bleeding. Defendant testified, however, that he did not see any blood. He then hit Scott in the nose "in defense" because Scott still had the knife and he was afraid that she would stab him "again." Defendant stated that after he hit Scott she "wasn't so resistent [*sic*] anymore." Defendant then "lifted off" of Scott and noticed blood on the couch. Defendant stated that he then "raised her up," but Scott still had the knife. Defendant instructed Scott to drop the knife, but she refused. At that point, defendant "forc[ed] her to break the knife into the couch." The blade of the knife ended up on the pillow on the couch and Scott subsequently dropped the handle of the knife.

¶ 19 Defendant testified that, after he realized that Scott had been cut with the knife, he lifted her off the couch and walked her to the bathroom to help her stop the bleeding. In the bathroom, defendant sat Scott on the side of the tub. He then ran cold water over a washcloth and applied it to her wrist to help stop the bleeding. Defendant testified that it took only about a minute to control the bleeding. According to defendant, Scott did not pass out in the bathroom.

¶ 20 Defendant stated that there was no telephone in Scott's apartment, so he planned to escort her to the security office to call an ambulance. However, before he could do so, Scott jumped up and ran out of the apartment. At the time, defendant was in the bedroom getting Scott some clothes. Defendant did not realize that Scott had left until he saw that the chain on the door was off. Defendant looked into the hallway, but could not determine where Scott had gone. Accordingly, he finished putting on his clothes and went to a friend's house. Defendant stated that he left the building because he "panicked" and "was afraid of what might happen." Defendant explained that he had had "some past dealings" with the police, including two Class 4 drug possession convictions, one in May 2006 and one in December 2001.

¶ 21 Defendant testified that during the March 2006 incident he was thinking of what happened in December 2005. He explained that, on Christmas Eve 2005, Scott left their house and told him that she would return shortly. However, Scott did not return until the following morning. Defendant verbally confronted Scott, but Scott refused to explain her whereabouts. Defendant stated that the confrontation became physical when Scott attempted to leave again and he grabbed her arm. A struggle ensued, and the two fell to the ground. Scott bit defendant, and he swung at her in a "reflexive" manner to get his hand out of her mouth. Defendant released Scott, and she ran to the kitchen, opened a drawer, and grabbed

-6-

a knife. Scott pointed the knife at defendant and stated that she was "gonna get" him. Defendant backed up and told Scott to put the knife down. However, she eventually stabbed him in the left arm just below the elbow. Defendant stated that his punch resulted in a black eye to Scott. Defendant testified that the police never came in response to the December 2005 altercation.

¶ 22    Defendant testified that he saw Scott three times after the March 2006 incident. The first such occasion was around Father's Day 2006 in Chicago. According to defendant, Scott called him and indicated that she was in Chicago visiting her parents. Although defendant initially resisted Scott's request to meet, he ended up spending an entire day with her. Defendant testified that he met Scott a second time in August 2006 at defendant's parents' house in Chicago. The third meeting also occurred in August 2006, on defendant's birthday. At that time, Scott invited defendant over to her parents' house and they spent half a day together. Defendant denied that during any of these encounters Scott asked him to turn himself in or that there were any confrontations or problems.

¶ 23    On cross-examination, defendant testified that, when he grabbed Scott in March 2006, her back was to him. Defendant testified that his body weight was leaning on Scott, and this caused her to fall forward onto the couch. At some point in time, the knife punctured Scott's arm. According to defendant, however, the knife did not break while it was in Scott's arm. Defendant denied punching Scott in her right eye with his left fist. He stated that he threw only one punch and that it happened to land on the left side of Scott's face and break her nose. Defendant also acknowledged that he grabbed Scott's left wrist with such force that it became swollen. Defendant stated that at no point during the night was he bleeding and that any blood in the apartment belonged to Scott. Defendant admitted that, after he left Scott's apartment, he never went to the security office in Scott's building and never contacted the authorities.

¶ 24    After closing arguments, the trial court instructed the jury in pertinent part:

"The defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

The jury was also instructed on the use of force as follows:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person.

-7-

A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor."

Following deliberations, the jury acquitted defendant of the charges related to the knife wound to Scott's arm but convicted him of the other two counts, which alleged that defendant punched Scott in the face, causing permanent disfigurement (a laceration) and great bodily harm (a broken nose). Upon the motion of the State, however, the trial court, citing the one-act, one-crime rule, vacated the conviction of aggravated domestic battery (permanent disfigurement). Defendant was sentenced to seven years' imprisonment. Following the denial of his posttrial motion, defendant filed the present appeal.

¶ 25                                II. ANALYSIS

¶ 26                                A. *Voir Dire*

¶ 27    On appeal, defendant first argues that he was denied a fair and impartial jury by the court's failure to question prospective jurors during *voir dire* in compliance with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). We note initially that defendant did not object to the manner in which *voir dire* was being conducted and he did not include this issue in his posttrial motion. Normally, such omissions result in forfeiture of the contested issue on appeal. *People v. Barrow*, 133 Ill. 2d 226, 260 (1989). Defendant contends, however, that application of the forfeiture rule should be relaxed because the issue raised on appeal concerns the conduct of the judge. See *Barrow*, 133 Ill. 2d at 260 ("[T]his court has held that a less rigid application of the waiver rule prevails where misconduct of the trial judge is involved."). However, in *Thompson*, our supreme court rejected this position. *Thompson*, 238 Ill. 2d at 612. The *Thompson* court explained that, when the conduct of the trial court is at issue, the forfeiture rule may be relaxed only in extraordinary circumstances such as when the court ignores an objection to Rule 431(b) questioning or oversteps its authority in the presence of the jury. *Thompson*, 238 Ill. 2d at 612. Here, as in *Thompson*, there is no indication that the trial court would have ignored an objection to Rule 431(b) questioning had defendant raised one. Further, defendant does not allege that the trial court overstepped its authority in the jury's presence. Accordingly, we find no compelling reason to relax the forfeiture rule in this case.

¶ 28    Alternatively, defendant asks us to review this issue pursuant to Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). Rule 615(a) creates an exception to the forfeiture rule by allowing courts of review to note "[p]lain errors or defects affecting substantial rights." A reviewing court may consider a forfeited error under the plain-error rule when "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or when "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). As the supreme court explained, the "closely balanced evidence" prong of the plain-error doctrine "guards against errors that could lead to the conviction of an innocent person," while the substantial-rights prong "guards against errors that erode the integrity of the judicial process and undermine the fairness of the defendant's trial." *Herron*, 215 Ill. 2d at 186. In order for plain error to exist, however, we must first determine if an error actually occurred.

*People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

¶ 29	According to defendant, Rule 431(b) requires the trial court to ascertain during *voir dire* each potential juror's understanding and acceptance of the legal principles that: (1) the defendant is presumed innocent; (2) the State must prove the defendant guilty beyond a reasonable doubt; (3) the defendant need not present any evidence on his own behalf; and (4) the defendant's failure to testify cannot be held against him. See Ill. S. Ct. R. 431(b) (eff. May 1, 2007). Defendant claims that, during jury selection in this case, the court did not ask *any* prospective juror about his or her understanding and acceptance of *all* of the principles listed in Rule 431(b). Thus, defendant asserts, the trial court's incomplete questioning violated Rule 431(b) and deprived him of a fair and impartial jury. The State responds that Rule 431(b) is sufficiently complied with if, after being informed of the four principles set forth in Rule 431(b), each of the prospective jurors agrees to follow the law as given by the trial court. Because the admonishments provided by the trial court in this case conformed with this procedure, the State reasons that each prospective juror understood and accepted the principles contained in Rule 431(b) and thus no error occurred through the manner in which the trial court questioned the prospective jurors.

¶ 30	We begin our analysis by reviewing the genesis of Rule 431(b). Rule 431(b) was promulgated to give effect to our supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472 (1984). See Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997). In *Zehr*, the trial court refused defense counsel's request to ask prospective jurors during *voir dire* three supplemental questions concerning the State's burden of proof, the defendant's right not to testify, and the presumption of innocence. The supreme court held that the trial court's refusal to ask the questions posed by defense counsel constituted "prejudicial error" and required reversal of the judgment. *Zehr*, 103 Ill. 2d at 477-78. The court explained:

"We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. *** We agree with the appellate court that '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' [citation], and although they need not have been asked in precisely the form submitted, the subject matter of the questions should have been covered in the course of interrogation on *voir dire*." *Zehr*, 103 Ill. 2d at 477.

The four principles cited by the supreme court have become known as the *Zehr* principles. *People v. Martinez*, 386 Ill. App. 3d 153, 158 (2008), *overruled in part on other grounds*, *People v. Johnson*, 237 Ill. 2d 81, 99-100 (2010).

¶ 31	In 1997, to ensure compliance with the requirements of *Zehr*, the supreme court rewrote Rule 431. Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997). Although the Illinois Supreme Court Rules Committee recommended that the revised rule require the trial court to question prospective jurors on each of the *Zehr* principles, the supreme court modified the

proposal so that questioning on the *Zehr* principles would be required only if the defendant so requested. *People v. Glasper*, 234 Ill. 2d 173, 187 (2009) (citing Illinois Supreme Court Rules Committee, Recommendations to the Supreme Court of Illinois (March 1997)). To effectuate the supreme court's intent, the 1997 version of Rule 431 added subsection (b), which provided in relevant part that, "[i]f requested by the defendant, the court shall ask each potential juror, individually or in a group, whether that juror understands and accepts" the four *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. May 1, 1997). According to the committee comments, the new language sought to "end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997).

¶ 32 More recently, the supreme court amended Rule 431(b) to eliminate the requirement that the defendant request the trial court to ask prospective jurors about the *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. May 1, 2007). Thus, Rule 431(b) now provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

Since jury selection in defendant's trial commenced after May 1, 2007, the 2007 version of Rule 431(b) governs this case.

¶ 33 The supreme court has clearly indicated that its rules are not aspirational or mere suggestions. *Glasper*, 234 Ill. 2d at 189; *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995). Rather, they have the force of law, and there is a presumption that they will be obeyed and enforced as written. *Glasper*, 234 Ill. 2d at 189. To this end, we interpret supreme court rules in the same manner as statutes. See Ill. S. Ct. R. 2(a), Committee Comments (eff. July 1, 1982) ("Paragraph (a) makes it clear that the same principles that govern the construction of statutes are applicable to the [supreme court] rules."); *In re J.T.*, 221 Ill. 2d 338, 355 (2006) ("Our rules of statutory construction apply with equal force to the interpretation of all supreme court rules."). The cardinal rule of construction is to ascertain and give effect to the intent of the drafter. *Thompson*, 238 Ill. 2d at 606; *People v. Allen*, 313 Ill. App. 3d 842, 846 (2000). The best evidence of the drafter's intent is the plain and ordinary language of the rule. *Thompson*, 238 Ill. 2d at 606; *J.T.*, 221 Ill. 2d at 355. Where the language of a rule is clear and unambiguous, it will be given effect without resort to any other interpretive aids. *Allen*, 313 Ill. App. 3d at 846. The interpretation of a rule is a matter of law subject to *de novo* review. *People v. Perkins*, 229 Ill. 2d 34, 41 (2007); *People v. Stewart*, 365 Ill. App. 3d 744, 751 (2006).

¶ 34    In *Thompson*, the supreme court, after applying the foregoing principles, stated:

> "The language of Rule 431(b) is clear and unambiguous. The rule states that the trial court 'shall ask' potential jurors whether they understand and accept the enumerated principles. While the prospective jurors may be questioned individually or in a group, the method of inquiry must 'provide each juror an opportunity to respond to specific questions concerning the [Rule 431(b)] principles.' The committee comments emphasize that trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' 177 Ill. 2d R. 431, Committee Comments.

> Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607.

¶ 35    After reviewing the record, we conclude that the trial court did not comply with the mandate of Rule 431(b). As noted previously, jury selection in this case commenced on June 11, 2007. The parties selected a jury of 12 plus 2 alternates over the course of two days from three panels of prospective jurors. Before the jury-selection process began, the trial court told the parties that it was required by supreme court rule to *voir dire* the prospective jurors regarding the principles that: (1) the defendant is presumed innocent of the charges against him; (2) before the defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to offer any evidence on his own behalf; and (4) the defendant's failure to testify cannot be held against him. See Ill. S. Ct. R. 431(b) (eff. May 1, 2007). Defense counsel told the trial court that she did not object to asking prospective jurors about the last principle. See Ill. S. Ct. R. 431(b) (eff. May 1, 2007) (providing that no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects). The court also cautioned the parties not to question the prospective jurors on any matters that the court covers in *voir dire*, including "discussions about burden of proof or presumption of innocence or reasonable doubt or anything like that."

¶ 36    Thereafter, the prospective jurors entered the courtroom, and during its initial comments to the venire, the trial court stated:

> "The defendant is presumed to be innocent of the charges against him. The defendant does not have to prove his innocence. He does [*sic*] have to testify or call any witnesses in his defense.

> If he chooses not to testify, you may not consider that decision in any way in arriving at your verdict. If he does choose to testify or present evidence, you are to consider that evidence in the same manner as any other evidence in the case.

> The State has the burden of proof beyond a reasonable doubt. This is their burden in every criminal case."

The court later told the venire that they had "an absolute duty to follow the law as given to

-11-

[them] by the Court, both during the case and at the end of the case."

¶ 37    The clerk then called the first panel of 14 prospective jurors from the venire, and the court began *voir dire*. The following exchange occurred between the court and the first panel of prospective jurors:

"THE COURT: Do each of you understand that in a criminal case such as this, the burden of proof is on the State to prove to you the defendant's guilt beyond a reasonable doubt; do you understand that?

(The jury panel collectively answers yes.)

THE COURT: Will each of you agree to apply and follow the law as stated by the Court, despite any personal feelings you might have about the law?

(The jury panel collectively answers yes.)

THE COURT: Can each of you keep an open mind throughout the trial, wait until the case is concluded to reach any conclusions about any of the fact questions in this case?

(The jury panel collectively answers yes.)

THE COURT: Do any of you have any biases or prejudices that prevents you from being a fair juror to both the State and to the defense?

(The jury panel collectively answers no.)"

After questioning individual prospective jurors regarding their previous experiences with crime and the justice system, the court posed the questions set forth below, which the first panel of prospective jurors answered as indicated:

"THE COURT: Do any of you have any personal beliefs or philosophical beliefs or religious beliefs that would make it difficult to sit in judging the guilt of the defendant?

(The jury panel collectively answers no.)

THE COURT: Is there anything about the nature of these charges in and of themselves that would affect your ability to be fair and impartial to both sides?

(The jury panel collectively answers no.)

THE COURT: If after you heard all the evidence in this case and arguments of counsel and have been instructed on the law that applies to this case, if you believe the State has proven the defendant's guilt beyond a reasonable doubt, do you understand it would be your duty to vote to find him guilty; do you understand that?

(The jury panel collectively answers yes.)

THE COURT: Can you do that?

(The jury panel collectively answers yes.)

THE COURT: On the other hand, if you reach the same end point in the case after you heard all evidence and arguments of counsel and instructions of law, you get back in the jury room, and you're not convinced beyond a reasonable doubt that the State has proven each and every element of the charge against the defendant, do you understand it would be your duty to vote to find him not guilty?

(The jury panel collectively answers yes.)

THE COURT: Could you do that?

(The jury panel collectively answers yes.)

THE COURT: Is there any reason I haven't asked you about that would affect your ability to be able to be fair to both sides in this case?

(The jury panel collectively answers no.)"

Seven members of the first panel were ultimately sworn in as jurors. The jurors were instructed to return the following day and were not present for the *voir dire* of the remaining panels.

¶ 38 The clerk then called the second panel, consisting of six prospective jurors, and the court began *voir dire*. The court asked the second panel whether it understood that the burden in a criminal case is proof beyond a reasonable doubt. The record reflects that the panel answered a collective "yes." The court also asked the panel as a group whether it "agreed with" the burden of proof and whether it could "apply and follow the law." The panel collectively answered both inquiries in the affirmative. In response to the court's questions, the panel members also indicated that they would not have any difficulty accepting the proposition that defendant was presumed to be innocent of the charges against him and they would be able to give defendant the presumption of innocence. The court also asked the members of the second panel whether they understood that it was the State's burden to prove defendant's guilt beyond a reasonable doubt. Again, the panel answered a collective "yes." In addition, the panel indicated that it understood that it had a duty to convict if the State were to prove defendant guilty beyond a reasonable doubt. Conversely, the panel indicated that it understood that it had a duty to acquit if the State failed to sustain its burden of proof. Finally, the court told the panel members that defendant did not have to testify or present any evidence and that, if defendant elected not to testify or present evidence, the jurors could not hold defendant's decisions against him in reaching a verdict. The panel members indicated collectively that they understood this principle. Ultimately, two members of the second panel were sworn in as jurors.

¶ 39 The following day, additional prospective jurors were summoned to the courtroom. During its initial comments to them, the trial court articulated the four principles outlined in Rule 431(b). The court also told the prospective jurors that they had "an absolute duty to follow the law and accept the law as given to you by the Court throughout the case." The clerk then called a third panel, consisting of 14 prospective jurors. During the *voir dire* process, the court posed some questions to the third panel collectively. Among those questions were whether the panel members understood that the State had the burden of demonstrating defendant's guilt beyond a reasonable doubt and whether they agreed with that proposition. The record reflects that the panel members collectively answered "yes" to both inquiries. Subsequently, the panel was asked if it would "apply and follow the law as stated by the Court." The panel members answered collectively that they would. The court also asked the panel members if they understood that defendant was presumed innocent and whether they would be able to give him that presumption. The panel members answered both inquiries in the affirmative. In addition, the court asked the panel members if they understood that defendant did not have to testify or present any evidence and that, if defendant elected

not to testify or present any evidence, the panel members could not hold that against defendant in reaching their verdict. Again, the panel members collectively answered "yes." Ultimately, three members of the third panel were sworn in as jurors and two members were sworn in as alternates.

¶ 40     This record establishes that the trial court questioned the members of the second and third panels of prospective jurors regarding all four *Zehr* principles and that it provided the members of those panels with an opportunity to respond whether they understood and accepted *some* of the principles. However, the trial court did not ensure that the prospective jurors from the second and third panels had the opportunity to respond whether they understood and accepted *all* of the *Zehr* principles. In particular, the trial court failed to ascertain whether the prospective jurors in the second and third panels accepted the principles that defendant was not required to offer any evidence on his own behalf and that defendant's failure to testify could not be held against him. More significant, an examination of the *voir dire* conducted by the trial court with respect to the members of the first panel establishes that, although the court did ask if the potential jurors understood and accepted one of the *Zehr* principles (that the State had the burden of proving defendant guilty beyond a reasonable doubt), the court did not ask them about their understanding and acceptance of any of the remaining three *Zehr* principles (that defendant was presumed innocent of the charges against him, that defendant was not required to offer evidence on his own behalf, and that defendant's failure to testify could not be held against him). Based on this record, we conclude that the manner in which the trial court conducted *voir dire* did not fully comport with the question and response process mandated by Rule 431(b) and therefore constituted error. See *Thompson*, 238 Ill. 2d at 607 (holding that trial court violated Rule 431(b) by failing to question prospective jurors regarding the third *Zehr* principle and whether they accepted the first principle). Having found error, we must now determine whether that error satisfies the plain-error doctrine.

¶ 41     In plain-error review, the burden of persuasion rests with the defendant. *Thompson*, 238 Ill. 2d at 613. Defendant challenges the trial court's failure to comply with Rule 431(b) under both prongs of the plain-error doctrine. We first address defendant's argument under the second prong of plain-error review. Defendant asserts that the trial court's failure to comply with Rule 431(b) was so serious that it denied him of his substantial right to a fair trial. In *Thompson*, however, the supreme court concluded that compliance with the 2007 version of Rule 431(b) is not indispensable to a fair trial. *Thompson*, 238 Ill. 2d at 614. The court explained that, as a general matter, the failure to comply with Rule 431(b) "does not implicate a fundamental right or constitutional protection, but only involves a violation of this court's rules." *Thompson*, 238 Ill. 2d at 614-15. Nevertheless, the court indicated that a trial court's failure to comply with Rule 431(b) would satisfy the substantial-rights prong of plain-error review if it rose to the level of "structural error." *Thompson*, 238 Ill. 2d at 613-14. The court defined a "structural error" as a " 'systemic error which serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." ' " *Thompson*, 238 Ill. 2d at 614 (quoting *Glasper*, 234 Ill. 2d at 197-98, quoting *Herron*, 215 Ill. 2d at 186). As an example of the type of error that would affect a defendant's right to a fair trial and challenge the integrity of the judicial process, the *Thompson* court cited a

finding that a defendant was tried by a biased jury. *Thompson*, 238 Ill. 2d at 614. In this case, defendant has not presented any evidence that the trial court's failure to fully comply with the mandates of Rule 431(b) resulted in a biased jury. In addition, he does not allege that the Rule 431(b) error otherwise constituted structural error. See *Thompson*, 238 Ill. 2d at 609 (recognizing other types of errors that have been deemed structural). Therefore, defendant failed to meet his burden of showing that the violation of Rule 431(b) constitutes plain error under the substantial-rights prong.

¶ 42       Defendant also asserts plain error under the closely-balanced-evidence prong of plain-error review.[1] Under this prong, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *Herron*, 215 Ill. 2d at 187. According to defendant, the evidence in this case was closely balanced because the jury's task was to decide between Scott's version of the facts and his version. In this regard, defendant notes that, while Scott testified that defendant initiated the March 2006 altercation, his testimony indicated that he hit Scott only because he thought she would stab him, based on her actions in a previous fight between the two. After careful review, we conclude, however, that the evidence was not closely balanced.

¶ 43       The jury found defendant guilty of one count of aggravated domestic battery (permanent disfigurement) and one count of aggravated domestic battery (great bodily harm) for the face laceration and the broken nose sustained by Scott. The trial court later vacated the former conviction under the one-act, one-crime doctrine. At trial and on appeal, defendant has not disputed that he hit Scott in the face. Thus, the only real question before the jury was whether defendant's use of force was justified. However, the evidence regarding the use of force was not closely balanced. For instance, defendant admitted that he initiated the March 2006 struggle when he approached Scott *from behind*. By defendant's own account, when he approached Scott she did not have a knife in her hand. Moreover, defendant admitted that he did not hit Scott in the face until *after* she told him that she had been stabbed. In addition, defendant's conduct after Scott ran out of the apartment was not consistent with an individual who was supposedly acting in self-defense. Notably, defendant's first instinct was not to contact building security or call an ambulance. Rather, following the stabbing, defendant

---

[1]Following the issuance of the supreme court's supervisory order in this cause, defendant filed a motion to file a supplemental brief upon remand to this court. In the motion, defendant asserts that his proposed supplemental brief would argue that the trial court's error is reviewable as plain error since the evidence at trial was closely balanced. We deny defendant's motion, for two principal reasons. First, although the closely-balanced-evidence prong was not addressed by the majority in our September 29, 2009, disposition, defendant did raise this argument when the case was previously before us. In rendering the present opinion, we have consulted the argument made in defendant's original brief and found it sufficient to address the closely-balanced-evidence prong. Second, defendant does not assert that the analysis under the closely-balanced-evidence prong of plain-error review has changed since he filed his original brief. Indeed, the *Thompson* court did not have occasion to address the closely-balanced-evidence prong of the plain-error rule, because the defendant in that case did not raise it.

opted to clean up and search for a change of clothes for Scott. In fact, at no point did defendant ever contact the authorities. Instead, he fled to a friend's house and eventually moved to Chicago.

¶ 44    Even if we were to find the evidence closely balanced on the use-of-force issue, we cannot conclude that the Rule 431(b) error alone tipped the scales of justice against defendant. The trial court's error resulted from its failure to (1) ask the first panel of prospective jurors if they understood and accepted the principles that defendant was presumed innocent of the charges against him, that defendant was not required to offer evidence on his own behalf, and that defendant's failure to testify could not be held against him and (2) ascertain whether the prospective jurors from the second and third panels accepted the principles that defendant was not required to offer any evidence on his own behalf and that defendant's failure to testify could not be held against him. However, all of the prospective jurors were preliminarily informed of all four *Zehr* principles during the trial court's initial comments to them. Further, defendant elected to testify at his trial, and the jury was instructed that defendant was presumed innocent of the charges against him. Thus, we cannot see how defendant could have been prejudiced by the trial court's failure to fully comply with Rule 431(b). Accordingly, we reject defendant's contention that the trial court's Rule 431(b) error requires reversal under the closely-balanced-evidence prong of the plain-error doctrine.

¶ 45                              B. Dr. Steffen's Testimony

¶ 46    Defendant also contends that the State violated Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) by calling a doctor to provide testimony without first disclosing, via a statement of his qualifications, the doctor's status as an expert. We disagree.

¶ 47    Prior to trial, defendant filed a "Motion for Discovery" requesting the State to disclose, *inter alia*, "[t]he names and last known addresses of persons whom the State intends to call as witnesses at a hearing or trial" and "[a]ll reports or statements of experts made in connection with the particular case *** and a statement of qualifications of the expert." As noted above, at trial, the State called Dr. Steffen, a board-certified radiologist at SwedishAmerican Hospital. The State elicited testimony as to Dr. Steffen's qualifications and experience. Thereafter, Dr. Steffen testified that, although he did not physically examine Scott, he did read all of her X rays and CAT scans. At that point, defense counsel objected, arguing that, although Dr. Steffen was disclosed as a witness, he was not presented as an expert. Defense counsel further represented that she was not given a copy of Dr. Steffen's *curriculum vitae*. The State responded that Dr. Steffen was properly disclosed as a "treating physician," and the trial court agreed. Thus, the trial court determined that the disclosure was sufficient and that the State was not required to provide the defense with a *curriculum vitae*. Dr. Steffen testified that a CAT scan of Scott's face showed a broken nose. Defense counsel opted not to cross-examine Dr. Steffen. Defendant was eventually convicted on the charge of aggravated domestic battery (great bodily harm) (720 ILCS 5/12—3.3(a) (West 2006)), with a broken nose constituting the element of great bodily harm. Thereafter, defendant filed a posttrial motion arguing, *inter alia*, that Dr. Steffen should not have been allowed to testify,

because the State had failed to disclose him as an expert. The trial court again rejected defendant's argument.

¶ 48    Rule 412 requires the State, when requested by the defense, to disclose certain material and information to a criminal defendant. The rule states in relevant part:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. \*\*\*

\* \* \*

(iv) any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert[.]" Ill. S. Ct. R. 412 (eff. Mar. 1, 2001).

The purpose of discovery rules, including Rule 412, is to protect the defendant from unfairness, surprise, and inadequate preparation and to afford the defendant an opportunity to investigate the circumstances from which the evidence arose. *People v. Leon*, 306 Ill. App. 3d 707, 712-13 (1999); see also *People v. Hood*, 213 Ill. 2d 244, 258 (2004). As with all discovery provisions, compliance with Rule 412 is mandatory and violations will not be easily excused. *Leon*, 306 Ill. App. 3d at 713.

¶ 49    Defendant asserts that the State violated Rule 412 by calling Dr. Steffen to provide testimony without first disclosing, via a statement of his qualifications, Dr. Steffen's status as an expert. Defendant further asserts that this discovery violation unfairly surprised and prejudiced him. The State responds that Dr. Steffen was called as a "treating physician," not an expert. Therefore, it was not obligated to provide a statement of his qualifications. Where, as here, the facts giving rise to the alleged discovery violation are not in dispute, we are presented with an issue of law, which we review *de novo*. *Hood*, 213 Ill. 2d at 256.

¶ 50    In *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226 (1988), the supreme court, in interpreting then-existing Illinois Supreme Court Rule 220 (eff. Oct. 1, 1984) (governing testimony of expert witnesses in civil proceedings at the trial court level), cogently explained the distinction between an "expert" and a "treating physician" as follows:

"Although the defendants argue that 'retained' in Rules 220(b)(1) and (c) refers broadly to witnesses who are 'requested' to give an opinion within their field of expertise, we consider it obliges litigants to disclose the identity and opinions only of those witnesses who are engaged for the purpose of giving an expert opinion at trial. It may be said that the connection between a medical expert who is 'retained to render an opinion at trial' and the party to the suit may be litigation-related, rather than treatment-related. Treating physicians, on the other hand, typically are not 'retained to render an opinion at trial' but are consulted, whether or not litigation is pending or contemplated,

-17-

to treat a patient's physical or mental problem. While treating physicians may give opinions at trial, those opinions are developed in the course of treating the patient and are completely apart from any litigation. Such an opinion is not formed in anticipation of a trial, but is simply the product of a physician's observations while treating the patient, which coincidentally may have value as evidence at a trial. In this respect, the opinions of treating physicians are similar to those of occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particular opinion on a disputed issue at trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation." *Tzystuck*, 124 Ill. 2d at 234-35.

As *Tzystuck* teaches, a treating physician is similar to an occurrence witness, in that, unlike an expert retained by a litigant, he is not controlled by a single party. Thus, the opposing party is not likely to be surprised by the treating physician's testimony. *Cochran v. Great Atlantic & Pacific Tea Co.*, 203 Ill. App. 3d 935, 940-41 (1990). Whether a doctor is a treating physician or an expert depends on the doctor's relationship to the case, not on the substance of his testimony. *Cochran*, 203 Ill. App. 3d at 940. In this regard, a treating physician is one consulted for treatment whereas an expert is one consulted to render an opinion at trial. *Cochran*, 203 Ill. App. 3d at 941; see also *Tzystuck*, 124 Ill. 2d at 234. Although, as defendant points out, the *Tzystuck* and *Cochran* cases interpret the civil discovery rules, we see no reason why the principles discussed in those cases should not apply to the criminal discovery rule at issue here, especially given the fact that the purposes of both sets of discovery rules are similar. Compare *Hood*, 213 Ill. 2d at 258 (noting that the purpose of the criminal discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation), with *Biehler v. White Metal Rolling & Stamping Corp.*, 30 Ill. App. 3d 435, 441-42 (1975) (noting that the purpose of the civil discovery rules is to enable attorneys to better prepare and evaluate their cases), and *Pink v. Dempsey*, 350 Ill. App. 405, 411 (1953) (noting that pretrial discovery is designed to permit exploration and avoid surprise).

¶ 51 Indeed, we recently relied on the foregoing passage from *Tzystuck* to address an issue similar to the one raised in the present case. In *People v. Cortez*, 361 Ill. App. 3d 456 (2005), the defendant was convicted of driving with a blood-alcohol concentration of 0.08 or greater (625 ILCS 5/11–501(a)(1) (West 2002)). On appeal, the defendant argued that the trial court erred in allowing a physician, who was not disclosed as an expert witness pursuant to Rule 412, to testify as to the effect of the use of an alcohol swab and the administration of a saline solution on the results of the defendant's blood test. Citing *Tzystuck*, we rejected the defendant's claim, holding that, although the physician's testimony technically constituted an "opinion," it was not rendered in anticipation of litigation. *Cortez*, 361 Ill. App. 3d at 465-66. Rather, the opinion was "simply the product of [the physician's] observations while treating [the] defendant." *Cortez*, 361 Ill. App. 3d at 466. We also rejected the defendant's claim as a practical matter, reasoning that, were we to adopt his position, all treating physicians would be required to testify as experts. *Cortez*, 361 Ill. App. 3d at 466.

¶ 52 Turning to the facts of this case, we find that the State fulfilled its disclosure requirements under Rule 412. Although Dr. Steffen did provide an "opinion" regarding

Scott's diagnostic films, he, like the physician in *Cortez*, was not retained to render an opinion at trial. Rather, as the radiologist on call at the hospital when Scott's diagnostic films were ready to be interpreted, Dr. Steffen was consulted for treatment of a medical problem. Accordingly, he testified not as an "expert" within the meaning of Rule 412(a)(iv) but as a treating physician. See *Cochran*, 203 Ill. App. 3d at 940 (qualifying a radiologist as a treating physician). Because Dr. Steffen was a treating physician, the State was required to comply only with subsection (a)(i) of Rule 412, which does not require it to submit a statement of qualifications to the opposing party. Defendant does not dispute that the State disclosed Dr. Steffen in accordance with Rule 412(a)(i). Moreover, the record indicates that the State tendered to defense counsel Scott's medical reports. Since defendant knew about Dr. Steffen's identity prior to trial and possessed Scott's medical reports, he could have undoubtedly discovered Dr. Steffen's opinion. See *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 890 (1992) ("[A]n opposing party will not be surprised when a treating physician testifies, because the witness was initially associated with the issues in litigation for reasons other than the sole purpose of rendering an opinion at trial."); *People v. Smith*, 236 Ill. App. 3d 35, 42 (1992) (holding that, because testifying doctor was a treating physician, his testimony should not have come as a surprise to the defendant). Accordingly, we conclude that no discovery violation occurred with respect to Dr. Steffen's testimony.

### III. CONCLUSION

¶ 53 For the reasons set forth above, we affirm the judgment of the circuit court of Winnebago County.

¶ 54 Affirmed.